**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**APPROXIMATELY $1,262,424.73 IN U.S. CURRENCY SEIZED FROM ACCOUNT NO. 898155633314 AT BANK OF AMERICA N.A. IN THE NAME OF ENVY SOUTH FLORIDA MEDICAL CENTER CORP.**

**Defendant *In Rem*.**

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, the United States of America, by and through its undersigned counsel, alleges as follows:

## I. NATURE OF THE ACTION

1. This is a civil action *in rem*, pursuant to 18 U.S.C. § 981(a)(1)(C) and the procedures set forth in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, and the Federal Rules of Civil Procedure, to forfeit seized funds[1], more fully described as approximately $1,262,424.73 in U.S. currency (the "Defendant Asset"), formerly on deposit in account number 8981 5563 3314 held at Bank of America, N.A. in the name of Envy South Florida Medical Center Corp. (the "Envy Account"), which was seized on or about September 9, 2025, to include accrued interest.

[1] All dates and amounts referenced in this Verified Complaint are approximate.

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction over this subject matter. *See* 28 U.S.C. §§ 1345, 1355(a); 18 U.S.C. § 981(a)(1)(C).

3. This Court has *in rem* jurisdiction over the Defendant Asset. *See* 28 U.S.C. §§ 1345, 1355(b).

4. Venue for this action is proper in this District because acts or omissions giving rise to the forfeiture occurred in the Southern District of Florida, and because this is the same District where the Defendant Asset was brought upon seizure. *See* 28 U.S.C. §§ 1355(b)(1), 1395(b).

## III. FACTUAL ALLEGATIONS

At all times material to this Action:

A. The Medicare Program and Skin Substitutes

5. The Medicare Program ("Medicare") was a federal health care program that provided free or below-cost health care benefits to individuals who are sixty-five years of age or older or disabled. The benefits available under Medicare were governed by federal statutes and regulations.

6. The United States Department of Health and Human Services ("HHS"), through its agency the Center for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.

7. Individuals who received benefits under Medicare were commonly referred to as "Medicare beneficiaries."

8. Medicare was a "health care benefit program," affecting interstate commerce as defined by 18 U.S.C. § 24(b).

9. Medicare was subdivided into multiple program "parts." Medicare Part B covered, among other things, physician services and outpatient care, including medically necessary skin substitute and skin graft products and applied to beneficiaries in non-facility settings, such as a beneficiary's home.

10. Skin substitutes, also referred to as cellular and/or tissue-based products or skin grafts, including placental-tissue-based allografts such as Procenta, were products used to aid in the closure of certain chronic, non-healing wounds, such as diabetic ulcers and pressure ulcers. Medicare reimbursed skin substitute products under product-specific Healthcare Common Procedure Coding System ("HCPCS") codes, billed in units of a set size.

11. Health care providers of items or services to Medicare beneficiaries were referred to as Medicare "providers." To participate in Medicare, providers were required to submit an enrollment application in which the providers agreed to comply with all Medicare-related laws and regulations. If Medicare approved a provider's application, Medicare assigned the enrolled provider a Medicare provider number.

12. A provider with a Medicare provider number could file claims with Medicare to obtain reimbursement for items and services rendered to Medicare beneficiaries. Enrolled Medicare providers agreed to abide by the policies, procedures, rules, and regulations governing reimbursement, and were given access to Medicare manuals and services bulletins describing billing procedures, rules, and regulations.

13. To receive payment from Medicare, providers submitted or caused the submission of claims to Medicare, either directly or through a billing company. A Medicare claim for a skin substitute product was required to set forth, among other things, the name and unique Medicare identification number of the beneficiary, the product provided and its size, the date of service, the place of service, the diagnosis, and the identity of the rendering provider.

14. A claim for a skin substitute product submitted to Medicare qualified for reimbursement only if the product was medically necessary for the treatment of the beneficiary's illness or injury, was ordered by a licensed physician or other qualified health care practitioner, and was provided to the beneficiary as billed.

B. Envy South Florida Medical Center Corp. and the Fraudulent Billing Scheme

15. As further discussed below, between in or around February 2025 through in or around April 2025, Envy South Florida Medical Center Corp. electronically submitted approximately $8,644,800 in fraudulent claims to Medicare as reimbursements for skin substitutes, skin grafts, and acellular placental-derived tissue allograft (commonly known as Procenta) that were medically unnecessary for the beneficiaries. Data provided by CMS shows that throughout April of 2025, Medicare disbursed approximately $3,592,309.49 to the Envy Account before the account was voluntarily frozen by Bank of America. Pursuant to the seizure warrant signed by Honorable Magistrate Judge Lauren F. Louis, the United States seized $1,262,424.73 in Medicare fraud proceeds from the Envy Account.

16. Envy South Florida Medical Center Corp. ("ENVY") was a Florida corporation, with its principal office address in Miami, FL, which is within the Southern District of Florida.

17. Florida Department of State Division of Corporations records reflected that ENVY was incorporated on October 31, 2023.

18. At all times relevant to this Complaint, the only corporate officer of ENVY was Jose Luis Sanchez Benitez ("SANCHEZ BENITEZ").

19. According to Medicare enrollment records, on December 5, 2024, ENVY enrolled in Medicare as a Clinic/Practice Group, listing Leonor Castillo Martinez as its Authorized Official.

20. On December 20, 2024, ENVY filed a change of ownership request, listing SANCHEZ BENITEZ, as the sole owner.

21. As part of its ownership change application, on November 15, 2024, ENVY also submitted a voided check and an electronic funds transfer ("EFT") Authorization Agreement listing the Envy Account.

<u>C. The Medicare Fraud Scheme</u>

22. As described below, between in or around February and in or around April of 2025, ENVY submitted false and fraudulent claims to Medicare totaling $8,644,800 for skin grafts, skin substitutes, and Procenta injections, that were medically unnecessary.

23. According to Medicare records, all claims submitted by ENVY to Medicare during this period included the same diagnosis code for PRESSURE ULCER OF UNSPECIFIED PART OF BACK, STAGE 1.

24. Law enforcement interviewed five of the Medicare beneficiaries whose Medicare identification numbers ENVY used to bill Medicare.

25. Each interviewed beneficiary stated that he or she was not familiar with ENVY, did not receive and did not need skin grafts and/or skin substitutes billed to Medicare using his or her Medicare identification number, and was not familiar with Physician 1, who appeared in the Medicare claims data as the rendering provider on all of ENVY's claims.

26. Physician 1 stated in an interview with law enforcement agents that he or she had never heard of ENVY, and he or she had not prescribed skin grafts and/or skin substitutes to the identified beneficiaries. Physician 1 stated that the identified Medicare beneficiaries were not his or her patients. Physician 1 was the sole provider for 100% of ENVY's total billed Medicare claims.

27. On July 25, 2025, investigators visited ENVY's purported office in Miami during business hours. The building directory did not list a tenant at the suite number ENVY alleged as its principal place of business. The suite was found completely empty, with no furniture or signs for ENVY or any other corporation. The leasing manager of the building provided investigators with a change of ownership contract, executed on February 25, 2025, listing SANCHEZ BENITEZ as the current owner of ENVY. There were no signs indicating ENVY was an active and legitimate business.

D. The Defendant Asset

28. The United States obtained bank records for the Envy Account, which showed that as of April 1, 2025, when Medicare disbursements into the Envy Account began, the account had a balance of $480.13.

29. During the month of April 2025, as a result of ENVY's claims for reimbursement, Medicare deposited $1,262,424.73 in U.S. currency into the Envy Account[2].

30. These Medicare deposits constituted approximately 99.96% of all total deposits into the Envy Account[3].

| EFT Check Date | EFT Amount | Deposited Account Number |
|---|---|---|
| 04/10/2025 | $285,072.72 | 8981 5563 3314 |
| 04/11/2025 | $285,047.26 | 8981 5563 3314 |
| 04/14/2025 | $285,072.72 | 8981 5563 3314 |
| 04/15/2025 | $285,072.72 | 8981 5563 3314 |
| 04/16/2025 | $122,159.31 | 8981 5563 3314 |
| **TOTAL** | **$ 1,262,424.73** | |

31. Based on bank records, on or about May 8, 2025, Bank of America closed the Envy Account and transferred its entire balance of $1,262,904.86 into a hold harmless account.

32. An analysis conducted in accordance with generally accepted accounting principles demonstrated that, as of September 5, 2025, the Envy Account's balance of $1,262,424.73 was traceable to Medicare reimbursements.

33. On September 9, 2025, pursuant to the seizure warrant signed by the Honorable

[2] A portion of the total funds that were approved for payment ($3,592,309.49) were held by CMS through a payment suspension based on credible allegations of fraud. When CMS implemented a payment suspension, claims were still processed but approved payments are held in escrow.
[3] The bank records reflect multiple withdrawals and deposits of identical amounts in April 2025, in which withdrawals are made and then re-credited with a "return of posted check" indicating that the checks were rejected and the funds were not effectively debited from the account.

Magistrate Judge Louis, the United States seized $1,262,424.73 in Medicare fraud proceeds from the Envy Account (the "Envy seizure warrant"). *See* Case No. 25-MJ-03704-LOUIS (S.D. Fla.).

34. Pursuant to the Envy seizure warrant, Bank of America remitted to the Federal Bureau of Investigation ("FBI") $1,262,424.73 in U.S. currency from the Envy Account (the "Defendant Asset").

## IV. BASIS FOR FORFEITURE

35. Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a specified unlawful activity or a conspiracy to commit such offense is subject to civil forfeiture.

36. Pursuant to 18 U.S.C. § 1956(c)(7)(F), any act or activity constituting an offense involving a "Federal health care offense" constitutes a specified unlawful activity.

37. Health care fraud, in violation of 18 U.S.C. § 1347, is a "Federal health care offense." *See* 18 U.S.C. § 24(a). Medicare is a "health care benefit program" as defined in 18 U.S.C. § 24(b).

## FIRST CLAIM
**Proceeds of Health Care Fraud**
**18 U.S.C. § 981(a)(1)(C)**

38. The factual allegations in paragraphs 1 through 37 are re-alleged and incorporated by reference as if fully set forth herein.

39. As set forth above, the Defendant Asset is property that constitutes or is derived from proceeds traceable to health care fraud, in violation of 18 U.S.C. § 1347, which is a specified unlawful activity pursuant to 18 U.S.C. § 1956(c)(7)(F).

40. Accordingly, the Defendant Asset is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

**WHEREFORE**, Plaintiff, the United States of America, requests that the Clerk of the Court issue a warrant for the arrest *in rem* of the Defendant Asset; that notice of this action be provided to persons known or thought to have an interest in or right against the Defendant Asset; that the Defendant Asset be forfeited and condemned to the United States of America; and for such other and further relief as may be deemed just, necessary and proper.

Respectfully submitted,

**YARA LORENZO KLUKAS**
**ACTING UNITED STATES ATTORNEY**

By: */s/ Sandra Demirci*
Sandra Demirci (Court ID A5503244)
Assistant United States Attorney
500 East Broward Boulevard
Fort Lauderdale, FL 33394
Telephone: (954) 660-5959
E-mail: sandra.demirci@usdoj.gov
*Counsel for United States of America*

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, Alexandria Davis, hereby verify and declare, under penalty of perjury, that I am a Special Agent with the Federal Bureau of Investigation and that I have read the foregoing Verified Complaint for Forfeiture *In Rem* and that the foregoing factual allegations are true and correct to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement agents, as well as my investigation of this case, together with others, as a Special Agent of the Federal Bureau of Investigation.

Executed on this 12 of November 2026.

Alexandria Davis, Special Agent,
Federal Bureau of Investigation